947 So.2d 810 (2006)
STATE of Louisiana
v.
Leo BATISTE.
No. 2006-KA-0875.
Court of Appeal of Louisiana, Fourth Circuit.
December 20, 2006.
*811 Eddie J. Jordan, Jr., District Attorney of Orleans Parish, Graham L. Bosworth, Assistant District Attorney of Orleans Parish, New Orleans, Louisiana, for Plaintiff/Appellee.
Sherry Watters, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Court composed of Judge JAMES F. McKAY, III, Judge DENNIS R. BAGNERIS, Sr., Judge TERRI F. LOVE.
JAMES F. McKAY, III, Judge.
STATEMENT OF CASE
On September 1, 2004, the State charged the appellant Leo Batiste with the manslaughter of Alfred Smith. At his arraignment on September 7, 2004, he pled not guilty. The court heard and denied his motions to suppress the evidence and statement on November 3, 2004. On January 5, 2005, a twelve-person jury found Batiste guilty as charged. The court ordered a presentence investigation report. On May 6, 2005, the court sentenced Batiste to serve twenty years at hard labor. The next day the court granted his motion for appeal.
FACTS
On July 3, 2004, Leon Batiste shot and killed Alfred Smith, Sr. in the 2600 block of Danneel Street. Officers responding to the call of the shooting found Smith lying facedown on the ground in front of a table set with dominos. An autopsy revealed that Smith died of a single gunshot wound from a bullet that entered his chest under his left arm, passed through his heart and lung, and lodged in his spine. The pathologist who conducted the autopsy testified that a muzzle imprint on the skin under Smith's arm indicated that Smith received a direct-contact wound. Smith also had a blood alcohol level of .11%, but his fluids were negative for street drugs. The pathologist also testified that the wound was consistent with a right-handed person shooting the victim in close proximity while facing him; he also stated that he could not tell if the victim and the shooter were standing or lying down when the victim was shot.
Officer Kristian Fricke testified that he and his partner Travis Ward responded to the 911 call of the shooting, which was played to the jury. Officer Fricke stated that there had been many domino games in the area where the shooting occurred, but there had been no problems with the games in the past. He testified that when he and his partner arrived, there were a few people on the scene who directed him to a blue Ford pickup truck, where he discovered the defendant Leon Batiste. Officer Fricke stated that he and his partner opened the door of the truck and ordered Batiste to exit. He testified his partner then saw a gun sitting in the center console of the truck. The officers handcuffed Batiste and read him his rights. Batiste stated that he shot the victim over a $20 dominos bet. Officer Fricke testified that they found a $20 bill on the back of the driver's seat. Officer Fricke described Batiste's demeanor as calm, and he was attached to a oxygen canister that was sitting on the passenger seat of the car.
Officer Ward's testimony basically tracked that of Officer Fricke. He testified that the gun found inside Batiste's truck *812 had bloodstains on it, and he seized the gun. The gun contained four live rounds, and there was a spent casing on the ground.
Detective Christian Varnado testified that he investigated the shooting. He stated that he found the victim lying on the ground in front of 2613 Danneel Street. He testified that he directed the responding officers to take Batiste to the police station, where Batiste gave a statement. Detective Varnado testified that witnesses on the scene told him that Batiste and Smith had argued over a $20 bet on a dominos game that neither of them won. The witnesses told Detective Varnado that Smith told Batiste to go to his truck to get his "s* * *," meaning his gun, and after Batiste had done so, he came back to the dominos table. Witnesses told him that Smith and Batiste argued some more, and Smith grabbed Batiste in a bear hug. The men scuffled, and then Batiste shot Smith. Detective Varnado testified that he found $4 lying on the ground next to Smith's hand. Detective Varnado also testified that John Curtis identified Batiste as the man who shot Smith.
The State played Batiste's statement, in which he indicated that he was playing dominos with Smith and a few other people just prior to the shooting. Batiste stated that he and Smith had a $10 side bet that Batiste was not going to let Smith win the game. Neither of them won the game, however, and Batiste considered the bet void. He stated that Smith then wanted his money because Batiste lost the game. Instead, Batiste stated, he went toward his truck. At that point, Smith said, "Go get your s* * *". Do what you got to do." Batiste indicated that Smith had become enraged during prior games, kicking over the dominos table, slapping people, and pulling a knife. Batiste stated that he was too old to be fighting, so he got his gun and walked back to the table where the $20 bill was still lying. Batiste stated that Smith told him there was the money and to take it. When Batiste reached over to pick up the money, Smith grabbed him, and the two men fell to the ground. Batiste admitted that he got his hand loose and pulled the trigger, but nothing happened. He stated that he pulled the trigger again, and the gun fired, hitting Smith. Batiste stated that the gunshot surprised him, and he insisted that he did not want to kill Smith, but he was merely trying to protect himself from a man whom he knew carried a knife. Smith pointed out that the police found a knife in Smith's pocket. He insisted that he "believed at that moment, it was kill or be killed."
After Batiste's statement was read, Detective Varnado confirmed that a box-cutter type knife was found closed in Smith's pocket. He also testified that Batiste told him on the day of the shooting that Smith drew a knife on him.
The firearms examiner testified that the bullet found in Smith's body was fired from the gun found in Batiste's truck.
Andrew Dunbar testified that he was playing dominos with Batiste, Smith, and John Curtis on the day of the shooting. He testified that although normal bets were $3, Smith and Batiste had a $10 side bet as to whether Smith would win. Neither Smith nor Batiste won the game, and Batiste said that he quit playing. Dunbar testified that as Batiste reached for his money, he and Smith argued. Although Dunbar first testified that Batiste went to his truck, got a gun, and came back, he later stated that he did not see Batiste go to his truck because he (Dunbar) turned and began walking away. Dunbar stated that he heard a shot, looked around, and saw the two men struggling on the ground. He stated that he heard Smith say that he *813 was "dead," and then Dunbar walked around the corner to get a drink. Dunbar identified a photograph of the scene that showed the dominos table set up outside his house. He admitted he was an alcoholic and had a prior conviction for illegally carrying a weapon. He insisted he was sober that day, but he admitted he had consumed a few beers. He denied that any fights occurred over dominos games in the past, and he did not see Smith with a knife that day, although he had seen him with a different knife in the past.
John Curtis testified that he was playing dominos with Smith, Batiste, and Dunbar just prior to the murder. He testified that Batiste had put up a $20 bill for the side bet and had taken Smith's $10 bill for change. Curtis testified that he won the game. He stated that Smith and Batiste argued about who won their side bet, and Batiste indicated he wanted to stop playing. Smith insisted that he could not do so. The men argued, and then Smith picked up the $20 bill. Curtis stated that when Batiste went to his truck, he thought Batiste was going to get money to pay Smith. Curtis indicated that Dunbar paid him for the game and walked off, and Smith had $3 in his hand to pay him for the game. Curtis testified that Batiste returned with a gun, and he told Batiste that the money from the side bet was on the table, where Smith was still seated. Curtis testified that Batiste got close to Smith, and Smith asked him if he was going to shoot him over a $10 bet. Curtis stated that Smith then "broke at him to grab" the gun. The men wrestled and fell to the ground. Curtis testified that as Smith rolled over, Batiste put the gun to Smith and fired. Curtis testified that Smith then stated, "Now, you done killed me" and dropped his head.
Curtis testified that Batiste then got up, took the $20 bill from the table, walked back to his truck, and started it. Curtis stated that he told Batiste he had to wait for the police to arrive to explain what happened. Curtis testified that Batiste thought about it for a little while and then agreed and turned off the truck's engine. Curtis also testified that Batiste could not leave because Smith was lying on the ground in front of him and Curtis was standing behind the truck.
Curtis admitted that the men sometimes argued over the dominos games, but he characterized this arguing as "messing" with each other. He stated that he had seen Smith with a knife before when Smith cut up a watermelon, but that knife was not the box cutter found in Smith's pocket. He testified that he had also heard about Smith getting in arguments in the past and overturning the dominos table, but these events did not take place in his presence. He denied telling the police that the men were standing when the gun went off; he explained that he said they were facing each other.
Curtis stated that Batiste did not threaten him during the incident. Curtis admitted he had prior convictions in the 1960's and 1970's for theft, simple burglary, illegally carrying a weapon, contributing to a delinquency of a minor, and possession of heroin, as well as a 2002 guilty plea for distribution of marijuana for which he still had a few days of probation to serve. He denied making any deals with the State for his testimony.
The defense played the tape of the statement Curtis gave to the police. In this statement, the officer taking the statement noted that the shooting took place at approximately 4:20 p.m. Curtis stated that Batiste and Smith each bet $10 that he would win, and when neither one won, Smith picked up the $20 total bet because Batiste did not win. Batiste replied that Smith did not win either and indicated he *814 wanted to quit playing. According to Curtis' statement, Smith told Batiste he could not quit and picked up the $20. Batiste asked if Smith was going to take his $10, and Smith replied, "No, you quit." Curtis stated that Batiste then went to his truck and came back with a gun. Batiste asked again if Smith was going to take his $10, and Smith replied that Batiste's $10 was "on the board." Curtis stated that Smith pushed his chair back from the table and grabbed Batiste in a bear hug. Curtis stated that Batiste raised his gun, put it to Smith's chest, and fired. Curtis stated that Batiste and Smith were standing face-to-face, just like they were dancing, when the gun fired.
DISCUSSION
A review of the record reveals no patent errors.
ASSIGNMENTS OF ERROR
By his first assignment of error, the appellant contends that there was insufficient evidence to support his conviction for manslaughter. He maintains that the State failed to negate his self-defense claim.
In State v. Brown, XXXX-XXXX (La.4/12/05), p. 22, 907 So.2d 1, 18, the Court set forth the standard for determining a claim of insufficiency of evidence:
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court "must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Neal, 00-0674 (La.6/29/01), 796 So.2d 649, 657 (citing State v. Captville, 448 So.2d 676, 678 (La.1984)).
See also State v. Sykes, XXXX-XXXX (La. App. 4 Cir. 3/9/05), 900 So.2d 156.
The appellant was charged with and convicted of manslaughter. La. R.S. 14:31 defines manslaughter in part as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
The statute further provides: "Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed . . ." See State v. Collor, 99-0175 (La.App. 4 Cir. 4/26/00), 762 So.2d 96. "Sudden passion" and "heat of blood" are not separate elements of the offense but are mitigating factors, which the defendant must establish by a preponderance of the evidence. State v. Jones, XXXX-XXXX (La.App. 4 Cir. 3/20/02), 814 So.2d 623; State v. McClain, 95-2546 (La.App. 4 Cir. 12/11/96), 685 So.2d 590. As noted by this Court in Collor:
Thus, in reviewing defendant's claim that the evidence supports a manslaughter verdict, this Court must determine whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors were not established by a preponderance of the evidence. *815 State v. Sanders, 93-0001, p. 18-19 (La.11/30/94), 648 So.2d 1272, 1287, cert. denied 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996).
State v. Collor, 99-0175 at p. 11, 762 So.2d at 103.
Here, the appellant shot and killed the victim during a dispute over a bet in a dominos game; these facts would support a finding of manslaughter. He argues, however, that his conviction cannot stand because the evidence did not exclude his claim that he killed the victim in self-defense. This Court discussed self-defense in State v. McClain, 95-2546 at pp. 8-9, 685 So.2d at 594:
A homicide is justifiable if committed by one in defense of himself when he reasonably believes that he is in imminent danger of being killed or receiving great bodily harm and that the homicide is necessary to save himself from that danger. La. R.S. 14:20(1). When a defendant claims self-defense, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. State v. Lynch, 436 So.2d 567 (La.1983); State v. Brumfield, 93-2404 (La.App. 4th Cir.6/15/94), 639 So.2d 312. Regarding self-defense, it is necessary to consider whether the defendant had a reasonable belief that he was in imminent danger of losing his life or receiving great bodily harm and whether the killing was necessary, under the circumstances, to save the defendant from that danger. State v. Dozier, 553 So.2d 911 (La.App. 4th Cir.1989), writ denied 558 So.2d 568 (La.1990). Although there is no unqualified duty to retreat, the possibility of escape is a factor in determining whether or not the defendant had a reasonable belief that deadly force was necessary to avoid the danger. Id.

See also State v. Jones, supra; State v. Gibson, 99-0946 (La.App. 4 Cir. 5/3/00), 761 So.2d 670.
In State v. Jones, the defendant was convicted of manslaughter and attempted manslaughter. The defendant and the deceased victim fought at a party, and the victim went home. He soon returned to the area, however, and raised his hands to the defendant as if to fight him again. The defendant shot the victim in the stomach and then ran after him, firing again as the victim tried to get away. A second victim, who appeared on the scene to try to head off the confrontation, grabbed at the gun while the defendant was running past him, and the defendant shot the second victim, who survived the attack. On appeal, the defendant argued that the State did not negate his self-defense claim, noting that the victims were intoxicated, that the deceased victim had physically fought with the defendant prior to the shooting, that the victim was much bigger than the defendant, and that the victim had threatened the defendant. This Court rejected this claim, noting that the jury apparently did not believe the defendant's claim that he fired at the victims in self-defense. This Court also noted that the defendant did not leave the area of the initial fight, but instead armed himself. In addition, this Court noted that the defendant repeatedly fired at the first victim, who was trying to run away from him after being shot in the stomach, and the defendant shot the second victim, who had not been involved in the initial altercation.
This Court also rejected self-defense challenges in State v. Ventry, 99-0302 (La. App. 4 Cir. 6/14/00), 765 So.2d 1129; State v. Gibson, supra; and State v. Byes, 97-1876 (La.App. 4 Cir. 4/21/99), 735 So.2d 758. In State v. Ventry, the defendant shot the victim in a bar while they were fighting. This Court discounted the defendant's *816 self-defense claim that he shot the victim as the victim was approaching him, noting that the victim was shot in the back. In State v. Gibson, the defendant claimed that she stabbed the victim while he was trying to choke her during an argument. On appeal of her conviction for manslaughter, this Court found that the jury could have found that the State negated the defendant's self-defense claim, noting that various family members of the victim who were in the house at the time of the stabbing testified that they did not hear an argument. In addition, the defendant initially told family members that she did not know why she stabbed the victim, and her statements were unclear as to whether the victim was choking her at the time she stabbed him repeatedly. In State v. Byes, the defendant first stated that he was in the car with the victim and another man when the other man shot the victim for refusing to pay for drugs. In his second statement, he admitted he shot the victim, but he insisted that the victim pulled the gun, and the gun fired as they were struggling over it. This Court rejected his self-defense claim, noting that two of the gunshots hit the victim in the back, and a witness testified that the defendant continued firing even after he had exited the car.
In State v. Osborne, XXXX-XXXX (La.App. 4 Cir. 12/6/00), 775 So.2d 607, the victim was harassing the defendant's female friend, and when the defendant sought to intervene, the victim threatened him and hit him, knocking him to the ground. Others on the scene broke up the fight. At some point the victim walked to a nearby store, and when he returned he began threatening the woman again. The defendant went to a nearby vacant lot where he kept a gun. The defendant loaded the gun, returned, and shot the victim twice, the second time because he was not sure if the first shot hit the victim. The defendant was seventy-two years old at the time of the offense, while the victim was much younger, much larger, and known for being violent. This Court rejected his self-defense claim on appeal, noting that while the evidence showed that the younger and larger victim physically and verbally assaulted the defendant, the defendant did not leave the area but instead armed himself and shot the victim twice.
Here, the appellant argues that he was in his seventies at the time of the crime, and the victim was much younger and stronger than he was. He points to the fact that he knew the victim carried a knife and had acted aggressively during prior dominos games, overturning tables and hitting people. He notes that he armed himself at the victim's suggestion, and he did not raise the gun until the victim grabbed him. Fearing for his life, he fired one time.
The appellant contends that he cannot be seen to have been the aggressor in this case because the victim started the fight and did not want him to quit playing or to give him his money. However, the fact remains that the appellant was free to leave the scene, although ten dollars poorer. He could have ignored the victim's suggestion that he get his gun, but instead he chose to arm himself and return to the presence of the man whom he claims he feared. Indeed, only the appellant mentioned that the victim told the appellant to get his gun; neither Dunbar nor Curtis, the men on the scene at the time of the shooting, testified that they heard the victim make this statement. Contrary to the appellant's assertions, he was free to leave, to remove himself from any harm he might have feared from the victim. Instead, he armed himself and went back to the victim, eventually shooting the victim when the victim grabbed him.
*817 The cases cited by the appellant do not support his claim. In State v. Price, 93-1472 (La.App. 4 Cir. 4/14/94), 635 So.2d 1298, the defendant claimed he stabbed the victim in self-defense after the victim threatened to kill him "the next time" and threw a beer at the defendant as the defendant turned to walk away. The defendant testified that he took the knife away from the victim in the ensuring fight and stabbed him. This court rejected the defendant's self-defense claim, noting that the other witnesses testified that the defendant had a knife before the fight started and that the victim had no knife, and this Court further noted that the victim sustained multiple knife wounds, two of which were mortal wounds and one of which was in the victim's back.
In State v. Moore, 568 So.2d 612 (La. App. 4 Cir.1990), the defendant claimed she shot her husband in self-defense. The pair had separated, with the victim moving his possessions out of the apartment they shared. The victim returned to the apartment to get some things he said he had left behind, but the victim refused to allow him to enter, believing that he had already taken all of his possessions. The victim cut the cable line and then attempted to get inside the door. The victim shot through the door, striking and killing the victim. The defendant alleged that she shot only to scare him away and that she was afraid for her safety because he had beaten her in the past. The victim's aunt, however, testified that shortly before the shooting the defendant said she was going to kill the victim. This Court rejected the defendant's self-defense claim and upheld her manslaughter conviction, finding that the locked door between the defendant and the victim kept her from having a reasonable fear of imminent danger.
In State v. Green, 505 So.2d 265 (La. App. 3 Cir.1987), the defendant confessed to stabbing the victim, but he insisted he did so in self-defense. The defendant and the victim spent a number of hours together drinking and smoking marijuana. The defendant contended that he and the victim got into an argument over drugs, and the victim pulled a knife and tried to stab him. Instead, he got the knife away from the victim and stabbed him as he tried to flee the vehicle in which they were sitting. On appeal, the court found that the evidence negated his self-defense claim. The autopsy showed that the victim was stabbed multiple times and had a great deal of both alcohol and marijuana in his system at the time of his death. Although the defendant claimed his injured foot would have precluded his being able to overpower the victim, the evidence showed that the defendant was able to move the victim's body several times, finally throwing it over a bridge into a bayou in order to conceal it.
In State v. Ruff, 504 So.2d 72 (La.App. 2 Cir.1987), and State v. Dill, 461 So.2d 1130 (La.App. 5 Cir.1984), the courts rejected the self-defense claim. In State v. Ruff, the defendant argued with his estranged wife's male friend (the victim) in a bar, and the victim then suggested that they take the matter outside. The two met in the parking lot, and as the victim was walking toward the defendant, the defendant shot him in the leg. The victim kept approaching, and the defendant repeatedly shot the victim again. Although the defendant was smaller than the victim and had health concerns, the court found that the defendant did not need to use deadly force because he could have escaped any physical danger.
In State v. Dill, the victim and his friend were in a parking lot where they could not start their car. The victim walked to the defendant's car parked nearby and tried to negotiate a jump, but apparently the defendant *818 and his friends tried to charge the victim money for their help. Several witnesses testified that the victim began arguing with the occupants of the defendant's car, and at one point the victim started walking over to the driver's door. The victim's friend testified that the defendant then opened his car door, reached between the seats, got a gun, exited the car, and shot the victim. The defendant and other defense witnesses testified that the victim pulled a knife on the defendant and tried to stab at him through the car's window. The jury convicted the defendant of manslaughter, and on appeal he reiterated his self-defense claim. The court rejected this claim, noting that the fact finder must have believed the State's witness rather than the defense witnesses. The court agreed that the victim was larger than the defendant and that they had argued, but the court noted that the defendant could have avoided the killing by simply driving away from the victim. The court held that the defendant's fear of the victim did not justify the use of deadly force by shooting the victim in the head.
By contrast, the courts reversed the defendant's convictions in State v. Williams, 483 So.2d 999 (La.1986) and State v. Carroll, 542 So.2d 762 (La.App. 4 Cir.1989). In State v. Williams, the victim had severely beaten the defendant a few days before the shooting and had threatened to kill him. The defendant was at his mother-in-law's house when he saw the victim drive up. The defendant left through a back door to try to avoid the victim, but the victim saw him outside, and the defendant shot the victim. The police found a rifle on the ground under the victim's body. The defendant admitted he shot the victim, but he insisted that he only did so because he saw what appeared to be the barrel of a gun in the victim's hands. The defendant was convicted of manslaughter, but the Court reversed his conviction, finding that the defendant shot the victim in self-defense. The Court noted that there was no indication that the defendant provoked the victim, there was no evidence that he was the aggressor, and there was evidence that the defendant was trying to avoid the victim when the victim confronted him with a gun.
In State v. Carroll, the defendant shot the victim in a barroom. The victim, much larger than the defendant, had argued with the defendant earlier that day. Although one witness testified that the victim's arms were down at the time the defendant shot him, other witnesses corroborated the defendant's statement and his testimony that the victim came at the defendant with a barstool just before the defendant shot the victim. In addition, the bullet entered the victim under his arm, an impossibility if the victim was merely standing before the defendant with his arms down. This court reversed the defendant's manslaughter conviction, finding that the State failed to show that the shooting was not in self-defense.
Here, unlike in State v. Williams, the defendant was not trying to avoid the victim when he shot him; instead, he armed himself and went back to the table to confront the victim. The victim was younger and larger than the defendant, but the defendant could have avoided the shooting by merely getting in his truck and driving away. As such, the evidence does not show that the defendant was justified in using deadly force to avoid being physically harmed. The State presented sufficient evidence to counter his self-defense claim beyond a reasonable doubt, and the jury did not err by convicting him of manslaughter. This assignment is without merit.
By his second assignment of error, the appellant contends that the trial court *819 imposed an excessive sentence. The court imposed a twenty-year sentence, one half the maximum sentence it could have imposed for the appellant's manslaughter conviction. See La. R.S. 14:31.
It is not clear, however, that this claim has been preserved for appeal. There was no objection to the sentence when it was imposed; the only "objection" was actually made by the trial court, which when after imposing sentence, stated: "The objection is noted for the record to protect the record on behalf of the defendant." There is no indication in the record that the appellant filed a motion to reconsider the sentence as required by La.C.Cr.P. art. 881.1, which mandates that a defendant must file a motion to reconsider sentence within thirty days of sentencing in order to preserve for appeal any claim as to sentencing. This Court has held that the failure to file a motion to reconsider sentence or to object to the sentence at the time it is imposed precludes a defendant from raising a claim about his sentence on appeal. State v. Rodriguez, XXXX-XXXX (La.App. 4 Cir. 2/14/01), 781 So.2d 640; State v. Tyler, 98-1667 (La.App. 4 Cir. 11/24/99), 749 So.2d 767.
Appellate counsel acknowledges former counsel's failure to object or file a motion to reconsider sentence and argues that the failure to do so constituted ineffective assistance of counsel. In State v. Mims, 97-1500 pp. 44-45 (La.App. 4 Cir. 6/21/00), 769 So.2d 44, 72, this Court discussed the standard to be used to evaluate an effective assistance of counsel claim:
The defendant's claim of ineffective assistance of counsel is to be assessed by the two-part test announced in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See State v. Fuller, 454 So.2d 119 (La. 1984). The defendant must show that his counsel's performance was deficient and that this deficiency prejudiced him. The defendant must make both showings to prove counsel was so ineffective as to require reversal. State v. Sparrow, 612 So.2d 191, 199 (La.App. 4 Cir. 1992). Counsel's performance is not ineffective unless it can be shown that he or she made errors so serious that he or she was not functioning as the "counsel" guaranteed to the defendant by the 6th Amendment of the federal constitution. Strickland, supra, at 686, 104 S.Ct. at 2064. That is, counsel's deficient performance will only be considered to have prejudiced the defendant if the defendant shows that the errors were so serious that he was deprived of a fair trial. To carry his burden, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 693, 104 S.Ct. at 2068.
See also State v. Crawford, 2002-2048 (La. App. 4 Cir. 2/12/03), 848 So.2d 615.
Here, the appellant argues that counsel was ineffective for failing to object to the sentence or to file a motion to reconsider the sentence. In the absence of the objection or the motion, the appellant cannot raise his excessive sentence claim, and the defendant can show prejudice only by proving that he would have been entitled to relief had counsel taken steps to preserve the issue on appeal. Thus, in order to determine if the ineffective assistance of counsel claim has merit, we must look to see if the appellant's excessive sentence claim has merit.
In State v. Smith, 2001-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4, the Court set forth the standard for evaluating a claim of excessive sentence:

*820 Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that "[n]o law shall subject any person to . . . excessive . . . punishment." (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Cann, 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462; cf. State v. Phillips, 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906.
See also State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Baxley, 94-2982 (La.5/22/96), 656 So.2d 973; State v. Landry, XXXX-XXXX (La.App. 4 Cir. 3/31/04), 871 So.2d 1235.
An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La.C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed. State v. Landry, supra; State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in State v. Major, 96-1214, p. 10 (La. App. 4 Cir. 3/4/98), 708 So.2d 813:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La. C.Cr.P. art. 881.4(D).
If the reviewing court finds adequate compliance with art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, "keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged." State v. Landry, XXXX-XXXX at p. 8, 871 So.2d at 1239. See also State v. Bonicard, 98-0665 (La. App. 4 Cir. 8/4/99), 752 So.2d 184.
Here, the trial court more than adequately complied with La. C.Cr.P. art. 894.1 in that its reasons for sentence are several pages long. The court noted that it had reviewed the presentence investigation report. The court stated that it was aware of the appellant's age, but it was also aware that the deceased had a young child. The court stated that the fight resulting in the victim's death arose from "trash talking" that ultimately provoked the shooting. Nonetheless, the court noted that the altercation resulted in the death of one person. The court stated that if the appellant had not armed himself, he would not be standing before the court convicted of shooting someone. The court reiterated that it had taken into consideration the appellant's age and physical condition, but the court believed that the sentence of twenty years was warranted even though the appellant was a first offender. Thus, although the trial court *821 did not enumerate the art. 894.1 factors, the record shows the basis for the court's sentence.
In addition, the appellant's sentence does not appear to be excessive as compared to the sentences imposed and upheld in other manslaughter cases. This court has upheld maximum forty-year sentences in cases where the killing arose from an argument. In State v. Jones, supra, the defendant shot the deceased and another man after the defendant and the deceased had fought and then separated, and the deceased returned to resume the fight. In State v. Bell, 2002-2349 (La.App. 4 Cir. 8/6/03), 854 So.2d 429, the defendant stabbed and strangled her lover during a quarrel. In State v. Williams, 99-2355 (La.App. 4 Cir. 12/13/00), 776 So.2d 604, the defendant and the victim argued, the defendant left and came back with a gun, and the defendant then shot the victim repeatedly. In State v. Ross, 98-0283 (La. App. 4 Cir. 9/8/99), 743 So.2d 757, the defendant had earlier stalked his ex-girlfriend and the victim, her new boyfriend. The defendant threatened the ex-girlfriend, followed her to the victim's house, and then shot the victim as he was sitting in his car. In State v. Sarkozy, 99-0386 (La.App. 4 Cir. 1/26/00), 755 So.2d 345, the defendant beat the victim to death in a fight over money. In State v. Gibson, supra, the victim armed herself with a knife during an alleged argument with her husband and stabbed him to death. The court imposed a forty-year sentence but then suspended thirty of those years. In State v, Stark, 98-0668 (La.App. 4 Cir. 5/26/99), 736 So.2d 331, the defendant argued with a woman, saw her at a stop sign later that day, got out, and shot her to death. The defendant had many prior convictions.
This Court has also upheld longer sentences for manslaughter than that imposed on the appellant. In State v. Jefferson, XXXX-XXXX (La.App. 4 Cir. 12/4/02), 834 So.2d 572, this Court upheld the defendant's twenty-five-year sentence. The defendant and the victim argued, and then the defendant shot the victim and another man, also taking their money. This Court noted that the argument would not have escalated to a killing if the defendant had not had a gun in his possession. In State v. Barrois, XXXX-XXXX (La.App. 4 Cir. 1/31/01), 778 So.2d 1273, the defendant beat and strangled his girlfriend. This court affirmed his sentence of twenty-five years. In State v. Pleasant, 99-2349 (La. App. 4 Cir. 11/8/00), 772 So.2d 910, the defendant and the victim argued; each left the area; when they returned, the defendant shot the victim in the back. This Court affirmed the defendant's thirty-year sentence. This Court also affirmed the defendant's thirty-year sentence in State v. Major, supra, where the defendant shot the victim who was sitting in his car after an altercation outside a bar.
In State v. Bowman, 95-0667 (La.App. 4 Cir. 7/10/96), 677 So.2d 1094, the defendant was with a group of people who shot the victim. Although the defendant was not the triggerman, the court found him to be a principal to the crime and sentenced him to serve thirty-three years. This Court upheld the sentence despite the facts that the defendant was a first offender and was only sixteen at the time of the shooting. The defendant in State v. Fountain, 93-2561 (La.App. 4 Cir. 12/15/94), 647 So.2d 1254 shot the victim in a fight over drugs. This Court upheld his twenty-one-year sentence, the maximum sentence allowed at the time of the offense. In State v. Taylor, 91-2496 (La.App. 4 Cir. 3/29/94), 635 So.2d 416, the defendant and the victim had fought several times in the past. The defendant and his companion happened upon the victim, who grabbed the companion. The companion was able to *822 break away, and the defendant shot the victim in the leg, then shot him four more times. This Court upheld the defendant's twenty-one year sentence. In State v. Page, 587 So.2d 170 (La.App. 4 Cir.1991), the defendant and the victim fought outside, and the victim then went inside his house to clean up. The victim armed himself with a broken bottle, entered the house, and stabbed the victim. Although the defendant was only seventeen at the time of the offense, this court upheld his twenty-one-year sentence. Likewise, this Court upheld a twenty-one-year sentence in State v. Berryhill, 562 So.2d 1105 (La. App. 4 Cir.1990), imposed on the defendant who shot his ex-girlfriend's new boyfriend as the victim, the ex-girlfriend, and the ex-girlfriend's baby were sitting in the victim's car.
In State v. McBride, 99-2904 (La.App. 4 Cir. 11/29/00), 776 So.2d 546, this Court found that a thirty-year sentence was excessive for a defendant who threatened the victim, left the bar where they had argued, and came back armed. The defendant and the victim argued again, and the defendant pulled his gun and shot the victim. This Court vacated the sentence, reducing it to fifteen years. However, the Supreme Court reversed this court's ruling and reinstated the thirty-year sentence. State v. McBride, XXXX-XXXX (La.2/8/02), 807 So.2d 836.
This Court also upheld similar or slightly less sentences than that imposed on the defendant. In State v. Osborne, supra, the seventy-two-year-old defendant attempted to stop a fight between the victim and the defendant's female friend. The victim had argued with the woman and the defendant earlier, and had kicked the defendant, knocking him down. The victim left, and when he came back he began harassing the woman again. The defendant told the victim to leave the woman alone. The defendant armed himself and shot the victim twice, admitting later that he did not really think the victim was going to kill him. The victim was much younger, stronger, and bigger than the defendant. This Court found that the defendant's twelve-year sentence was not excessive.
In State v. Lacey, 95-0449 (La.App. 4 Cir. 2/15/96), 669 So.2d 1303, the victim had argued with the defendant and his family for years. On the day of the shooting, the defendant's brother got into an argument with the victim, and the defendant came out of his house with a gun, shooting five times and hitting the victim once. This Court affirmed his eighteen-year sentence. In State v. Coleman, 94-0666 (La.App. 4 Cir. 12/15/94), 647 So.2d 1355, this Court affirmed the defendant's fifteen-year sentence. The victim had moved out of the trailer he had shared with the defendant, and the defendant shot the victim when he returned to the trailer. In State v. Sherrill, 611 So.2d 728 (La.App. 4 Cir.1992), the defendant argued with his roommate, left the apartment they shared, came back later, and shot him. This Court affirmed his fifteen-year sentence.
In comparison to the cases cited above, we find that trial court here did not impose an excessive sentence. Although the fact scenario in this case is closest to that of Osborne, where the defendant received a twelve-year sentence, the facts of this case are also similar to many of those cited above, including McBride, where the defendants received greater sentences than the one the trial court imposed in this case.
The appellant nonetheless argues that his sentence is excessive because of a mistake of fact/law made by the trial court, that being the court's statement at sentencing that the appellant had been originally charged with murder and that the jury found him guilty of the lesser charge *823 of manslaughter. The appellant argues that defense counsel was ineffective because he did not point out this mistake to the court. The appellant further argues that had the court realized that the jury did not return a lesser verdict but instead found the appellant guilty as charged, the court would have imposed a lesser sentence. This supposition, however, is speculative at best, especially given the reasons for sentencing the court gave prior to imposing sentence. In addition, at one point the court alluded to the facts of this case as a "classic manslaughter."
The appellant asserts that counsel was ineffective for failing to present mitigating evidence concerning the appellant's physical condition. Present counsel does not specify what health problems plague the appellant or plagued him at the time of sentencing. However, before imposing sentence the trial court noted that it had taken into consideration both the appellant's age and physical condition.
The appellant next alleges that counsel was ineffective for failing to bring to the court's attention the mitigating factors that the victim would not allow the appellant to leave and that the appellant shot the victim only after the victim grabbed him. The trial court was present throughout the entire trial and was clearly aware of the circumstances of the case. Moreover, the victim did not prevent the appellant from leaving. The victim may have told the appellant he could not quit the game, but he did not stop him from going to his truck; the appellant could have just as easily driven away from the victim as he could arm himself and return to the dominos table and the victim. In addition, the victim did not grab the appellant until the appellant returned with the gun.
The appellant lastly cites cases where defendants either received lesser sentences, or received greater sentences, which were vacated, but none of these cases mandates a finding by this Court that his sentence is excessive. The appellant cites this Court's opinion in State v. Soraparu, 96-0116 (La.App. 4 Cir. 2/5/97), 688 So.2d 1320, where this court found excessive a forty-year sentence imposed on a first offender who shot the victim during an argument. However, the Supreme Court reversed this court's ruling and reinstated the sentence, finding it was not excessive. State v. Soraparu, 97-1027 (La.10/13/97), 703 So.2d 608.
In State v. Matthews, 532 So.2d 270 (La.App. 3 Cir.1988) and State v. Taylor, 535 So.2d 1146 (La.App. 2 Cir.1988), the courts found the defendants' sentences excessive. In State v. Matthews, the defendant was intoxicated when he stabbed a co-worker. The court found the twenty-one-year sentence, the maximum sentence available at that time, to be excessive. In State v. Taylor, the defendant shot his former friend over the friend's failure to repay charges to the defendant's credit card bill. The defendant pled guilty to manslaughter and received an eighteen-year sentence. The appellate court vacated the sentence as excessive based on the fact that the sentence was near the maximum sentence the defendant could receive.
The appellate courts upheld sentences of twenty, twenty-one, and twenty-two years in the other cases mentioned by the appellant. In State v. Brown, 35,641 (La.App. 2 Cir. 8/20/03), 852 So.2d 1234, the defendant beat, strangled, and drowned his victim on a nature trail. The court upheld his twenty-year sentence. In State v. Taylor, 35,921 (La.App. 2 Cir. 4/3/02), 813 So.2d 1151, the court affirmed the defendant's twenty-two-year sentence. The defendant shot the victim after refusing to perform further sexual activity, put the victim's body in the victim's trunk, and drove around with the body in the trunk for *824 several days. In State v. Scott, 28,131 (La.App. 2 Cir. 2/28/96), 669 So.2d 664, the defendant pled guilty and received a twenty-one-year sentence. The defendant was a principal to a robbery/murder and hit the victim over the head when he tried to escape. The court affirmed his sentence. In State v. Maxie, 594 So.2d 1072 (La.App. 3 Cir.1992), the defendant and the victim had a history of confrontations over the victim's theft of the defendant's car stereo. The defendant shot the victim four times. The court imposed a sentence of twenty-one years, and the appellate court affirmed the sentence.
The appellant contends that because his crime most closely resembles that of State v. Taylor (presumably the 1988 case where the appellate court found the eighteen-year sentence excessive), his twenty-year sentence should also be found to be excessive. However, the major factor the court in Taylor recognized was that the eighteen-year sentence was very close to the maximum sentence available at that time, and the court was not convinced that the Taylor's crime was deserving of a sentence near the maximum sentence. By contrast, here, the appellant's sentence is one-half the maximum sentence. And as noted above, it is not out of line with other manslaughter sentences upheld by this court and the Supreme Court.
As noted in State v. Guzman, 99-1753, p. 15 (La.5/16/00), 769 So.2d 1158, 1167:
To constitute an excessive sentence, this Court must find that the penalty is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no reasonable contribution to acceptable penal goals and therefore, is nothing more than the needless imposition of pain and suffering. Id. The trial judge has broad discretion, and a reviewing court may not set sentences aside absent a manifest abuse of discretion. State v. Cann, 471 So.2d 701, 703 (La.1985).
Here, given the cases cited above, we do not find that the trial court abused its broad discretion by imposing a twenty-year sentence on the appellant for his manslaughter conviction. Because the sentence was not excessive, counsel was not ineffective for failing to object to it or to file a motion to reconsider it. This assignment has no merit.
Accordingly, we affirm the appellant's conviction and sentence.
AFFIRMED.